

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 12-182 (RWR) |
| | : | |
| FLOYD LEE CORKINS, II, | : | |
| | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

Had this case gone to trial, the United States would have proven beyond a reasonable doubt that:

### Introduction

On August 15, 2012, the defendant Floyd Lee Corkins, II (hereinafter "Corkins" or "the defendant"), armed with a loaded semi-automatic pistol he had purchased in Virginia, two additional loaded magazines, and a box of ammunition, traveled from Virginia to the office headquarters of the Family Research Council ("FRC") in Washington, D.C., intending to shoot and kill as many employees of the organization that he could. The FRC is a nationally-recognized conservative lobbying group that, according to its own mission statement, "shapes the public debate and formulates public policy that values human life and upholds the institutions of marriage and the family." Among other things, the FRC advocates against governmental recognition of gay marriage. When the defendant arrived at the FRC, Leonardo Johnson, a building manager and unarmed security guard seated at the receptionist desk in the first-floor lobby, asked to see the defendant's identification. Corkins reached into his backpack, pulled out the handgun, and pointed it at Johnson. Johnson charged Corkins and a struggle ensued, during

which Corkins shot Johnson in the arm. Despite the serious gunshot injury he sustained, Johnson managed to wrestle the gun away from Corkins and then subdued him at gunpoint until members of the D.C. Metropolitan Police Department ("MPD") arrived. While on the scene, Corkins told Johnson in sum and substance that "it was not about you [Johnson]," but about the FRC and its policies.

## The Shooting

On the morning of August 15, 2012, the defendant drove his family's car from Herndon, Virginia, to the East Falls Church Metro Station and took Metro rail into the District of Columbia with the intent of committing the shooting. After getting off the train at the Gallery Place Metro stop, he loaded a Sig Sauer P229 semiautomatic pistol he had purchased in Virginia six days earlier and walked to the FRC's headquarters, located at 801 G Street, NW, Washington, D.C.

At approximately 10:46 A.M., the defendant arrived in front of the FRC's secured front door. To gain access to the building, he falsely told Johnson, who was manning the lobby's receptionist desk at the time, that he was there for an interview as a prospective intern. Upon gaining entry, the defendant approached the receptionist desk and Johnson, and shortly thereafter attempted to shoot and kill him.

Three FRC security cameras captured the shooting incident, almost in its entirety. An exterior FRC security camera captured Corkins entering the front door of the FRC. A second camera positioned inside the lobby captured Corkins approaching the front reception desk, behind which Johnson was seated. The two men engaged in a brief verbal exchange while Corkins stood directly in front of the waist-high desk. After Johnson asked to see the defendant's identification, Corkins unshouldered his backpack, set it down on the floor in front of the desk,

and bent down to retrieve something from inside it. Meanwhile, Johnson stood up and moved to one side of the desk. Shortly thereafter, Corkins stood back up and leveled his pistol at Johnson's head/upper body, prompting Johnson to duck and then lunge for Corkins and the gun. Before Corkins could fire an initial shot, Johnson grabbed Corkins, and the two men struggled. During this struggle, Corkins fired his pistol three times, one shot of which struck Johnson in the left forearm area. Despite the gunshot wound and Corkins's subsequent discharges of the gun, Johnson succeeded over the course of the next 15-20 seconds in disarming Corkins and forcing him to the ground and onto his belly. Johnson then stood over Corkins, subduing him with the weapon. Around this same time, Corkins stated to Johnson in sum and substance, "It's not about you," it's about the FRC and its policies.

Moments later, another FRC employee in the lobby area at the time of the shooting used the front receptionist desk phone to call 911.[1] MPD officers in the vicinity responded to the FRC to find Johnson still holding Corkins at gunpoint. The MPD officers subsequently handcuffed and frisked Corkins on the scene. In a search of his person, the MPD officers discovered two fully loaded magazine clips (15 rounds each) in one of Corkins's front pants pockets, as well as a Metro card and a handwritten list. The handwritten list contained the names of four organizations, beginning with the FRC (and its D.C. street address), as well as the address for the Blue Ridge Arsenal in Virginia where Corkins had purchased the gun and other implements (described more fully below). Each of the four listed organizations are nationally recognized advocacy groups that openly identify themselves as having socially conservative agendas

---

[1] A third camera captured this employee's movements during the shooting incident. After hearing the first shot, the employee scrambled to the floor and remained there to escape physical harm until Johnson had effectively subdued Corkins.

supporting, among other things, legislation defining "marriage" as a relationship between one man and one woman and generally against legislation that would promote gay marriage. While on the scene, various MPD officers also overheard Corkins make several statements, the sum and substance of which included, "I don't like the organization and what it stands for" and "I don't like these people, and I don't like what they stand for."

After securing the scene, MPD officers transported Corkins to the Federal Bureau of Investigations' Washington Field Office ("FBI's WFO") to be processed for arrest and interviewed. Simultaneously, Johnson was taken by ambulance to Howard University Hospital's Emergency Room to treat his gunshot wound.[2] MPD officers also called for the MPD's Bomb Unit to inspect Corkins's backpack still on the scene. An MPD bomb technician physically examined the bag and its contents and found, among other items, a box of 50 rounds of 9mm ammunition that was compatible for use in the semi-automatic pistol and 15 individually-wrapped Chick-fil-A chicken sandwiches. MPD officers also recovered 3 spent 9mm cartridge casings from the crime scene.

The Defendant's Post-arrest Statements

---

[2] Johnson suffered a serious gunshot wound. After being shot and subduing Corkins, Johnson experienced intense pain while waiting for emergency medical personnel to arrive on the scene. After being transported to the hospital, he underwent emergency surgery to treat multiple "comminuted fractures" of his left radius and ulna–the two main bones in Johnson's left forearm were effectively "splintered or crushed" in multiple places. To treat these injuries, a surgeon inserted two metal plates into Johnson's left forearm to allow the shattered bones to heal. The gunshot caused Johnson to suffer soft tissue injuries and numerous bullet fragments remain in Johnson's arms permanently, as it was impractical to remove each and every one of them during surgery. Johnson remained in the hospital for approximately a week. Johnson's arm remained in a cast for several months, and he was unable to work during this time. Depending on how his bones heal, Johnson may have to undergo a bone graft. He is currently undergoing physical therapy.

At the FBI's WFO, two FBI agents booked Corkins and asked him a number of "public safety" questions. Afterwards, Corkins was advised of and waived his <u>Miranda</u> rights, and gave a videotaped statement to two other FBI agents. In his statement, Corkins provided a clear and detailed account of the facts and circumstances relevant to the shooting incident, including acknowledging that: (1) he intended to enter the FRC that day to kill as many people as possible and smother Chick-fil-A sandwiches in their faces; (2) he intended to kill the "guard" who confronted him in the lobby (i.e., Johnson); and (3) he had taken substantial steps in the preceding week in furtherance of carrying out the crimes. Among other things, Corkins made the following statements in sum and substance:

- The night before the shooting, he loaded three magazines with the plan to go to the FRC the next day and "basically opening fire."

- The night before the shooting, he received firearms training from Blue Ridge Arsenal in Chantilly, Virginia, where he had purchased the gun the week before.

- The day before the shooting, he went to a Chick-fil-A and purchased 15 chicken sandwiches with the intent of smearing them in the faces of his shooting victims "to make a statement against the people who work in that building . . . and with their stance against gay rights and Chick Fil-A. They endorse Chick-fil-A and also Chick-fil-A came out against gay marriage so I was going to use that as a statement."

- Once inside the FRC on the day of the shooting, he pulled the gun on the "guard," grappled with him, and in the course of doing so, he intentionally discharged the gun multiple times; the shooting was not an accident.

- He pointed the gun at the guard, and that he intended to shoot and kill the guard, and then go upstairs and shoot and kill "as many people as [he] could."
- He was a political activist and considered the FRC a lobbying group. He committed the shooting for political reasons. He had identified the FRC as an anti-gay organization on the Southern Poverty Law Center website.
- He had been thinking about perpetrating similar violence for years but just never went through with it.
- He purchased the gun the Friday before the shooting from Blue Ridge Arsenal.
- He converted the pistol from a 20-caliber to a 9mm pistol to "be more effective."
- If the police had not responded and caught him at the FRC, he planned to go directly to the second organization on his list and perpetrate a similar shooting there.
- He surveilled the FRC two days before the shooting.
- He initially wanted to make a bomb but did not have the patience to do it.

Consistent with Corkins's statement, the FBI's subsequent investigation confirmed that the defendant did not act impulsively in committing the shooting. Rather, in the week before the shooting, the defendant methodically planned it by: (1) purchasing the firearm, (2) researching and surveilling his intended targets, (3) receiving firearms training, and (4) purchasing and employing other implements of the crimes.

The Gun Purchase

On Thursday, August 9, 2012, Corkins went to the Blue Ridge Arsenal in Chantilly, Virginia, to purchase a firearm. He looked at different pistols and ultimately decided to purchase

the Sig Sauer P229 semiautomatic pistol, which he had converted from a 22-caliber to a 9 mm firearm. While there, a French television correspondent and her camera crew doing a piece on the ease with which firearms can be purchased in the United States filmed Corkins holding and pointing the P229 pistol, as well as identifying it by make and model to the correspondent. Corkins left and returned the next day, Friday, August 10, to pick up the pistol.

The Selection and Surveillance of the FRC and Other Targets

Consistent with his statement to the FBI, a subsequent search of Corkins's family computer revealed that on the afternoon of Sunday, August 12, Corkins used the computer to visit the Southern Poverty Law Center's website, as well as the websites for the FRC and the second organization on his handwritten list. The FBI later recovered from Corkins's home several printed Mapquest and Google maps, dated August 12, 2012, for directions to the FRC and the second organization, as well as the pad of stationary paper used by Corkins to create his handwritten list of targets.

On the afternoon of Monday, August 13, Corkins rehearsed his planned trip to the FRC. He drove his parents' car to the East Falls Church Metro stop, boarded the Metro train for downtown D.C., got off at the Gallery Place Metro stop, and walked to the FRC. Corkins went to the door of the FRC that afternoon, claiming to be there to meet someone, and giving the lobby receptionist, another FRC employee, a fictitious name. The FRC employee allowed Corkins access to the lobby area, but told him that there was no one in the building by that name after checking the employee directory. Corkins then left the building.

Obtaining Other Implements of the Planned Crimes at Chick-fil-A and K-mart

On the afternoon of Tuesday, August 14, Corkins went to a Chick-fil-A in Virginia to

purchase the 15 chicken sandwiches. The FBI later recovered from Chick-fil-A a date-and time-stamped video and a store receipt of Corkins's purchase that afternoon.

Shortly after visiting the Chick-fil-A, Corkins went to a nearby K-mart in Virginia and purchased the black backpack he used in carrying out the offense. The FBI later recovered from K-mart a time-stamped video and a store receipt of Corkins's purchase that afternoon.

### The Firearms Training

On Tuesday evening, August 14, Corkins received approximately two hours of firearms training with his newly-acquired pistol at Blue Ridge Arsenal. The FBI later recovered from Blue Ridge Arsenal a videotaped recording of Corkins engaged in shooting practice at the range that evening.

### **Other Evidence Relevant to the Defendant's Intent**

Pursuant to 22 D.C. Code § 3151, et. seq., Assault with Intent to Kill and Attempted Murder are enumerated "Acts of Terrorism" if committed with the requisite intent. On August 15, 2012, the defendant assaulted Johnson and the FRC with the intent to intimidate or coerce a significant portion of the civilian population of the District of Columbia and/or the United States; namely, any and all individuals associated with or supporting the FRC, like-minded organizations, or otherwise holding beliefs contrary to or advocating against gay marriage.

## Limited Nature of Statement of Offense

This proffer of evidence is not intended to constitute a complete statement of all facts known by the defendant. Rather, the limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for Corkins's plea of guilty to the charges of Interstate Transportation of a Firearm and Ammunition, Assault with Intent to Kill while Armed (Leonardo Johnson), and Act of Terrorism While Armed.

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 415793

By: _____
T. Patrick Martin
D.C. Bar No. 471965
Ann H. Petalas
Texas Bar No. 24012852
Assistant United States Attorneys
National Security Section
555 Fourth Street, N.W. (11th Floor)
Washington, D.C. 20530

**Defendant Corkins's Stipulation and Signature**

After consulting with my attorney, David Bos, Esq., and pursuant to the Plea Agreement entered into this day with the United States, I hereby stipulate that the above Statement of Offense is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

2 6 13
Date

_____
Floyd Lee Corkins, II
Defendant

**Defendant Corkins's Counsel's Acknowledgment**

I am counsel for the defendant, Floyd Lee Corkins, II. I have carefully reviewed the above Statement of Offense with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

2-6-13
Date

_____
David Bos, Esq.
Counsel for Defendant Floyd Lee Corkins, II